UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GRADY HUDSON, *et al.*,

    Plaintiffs,

vs.

PATRICIA CARUSO, *et al.*,

    Defendants.

                      /

Case No. 1:10-cv-58

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This matter is now before the court on "Plaintiffs' petition for preliminary injunction" (docket no. 40).

**I.    Background**

Plaintiffs have filed a nine-count civil rights action against defendants pursuant to 42 U.S.C. § 1983, The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), and for conspiracy under 42 U.S.C. § 1986. The complaint alleges that defendants: failed to provide a halal food diet at the Lakeland Correctional Facility (LCF) which is consistent with Shari'ah; prohibited plaintiffs from obtaining prayer oil; interfered with plaintiffs' ability to perform the "Eid Celebration/Fast of Ramadan" and the mandatory "breaking the fast at the end of each day;" compelled plaintiffs to eat haram ("Islamically prohibited" food); and prohibited plaintiffs from wearing "Islamically approved clothing" during Salat ("offering Prayer") which occurs "five times daily (at minimum)." Plaintiffs seek compensatory and punitive damages against defendants, and "Injunctive Relief for the immediate provision of halal Foods, and restoration of Plaintiffs['] rights to freely exercise their religion."

In their § 1983 claim, plaintiffs contend that defendants violated their "Fourteenth Amendment due process right to First Amendment protections" and their Fourteenth Amendment due process right to equal protection under the law. Specifically, plaintiffs' allege that they cannot practice their religion and that they are treated differently from other religious groups (i.e., Buddhist and Jewish prisoners). Plaintiffs also alleged that defendants violated RLUIPA, which prevents the government from placing a burden on prisoner's religious exercise:

> (a) No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1. Finally, plaintiffs alleged that defendants violated § 1986 because they conspired to deprive plaintiffs of their federal constitutional rights.

In the present motion, plaintiffs seek a preliminary injunction against defendant James Kevin O'Brien, LCF's food service director, to :

1). Restrain from prohibiting Plaintiffs Halal food during the Islamic Holy Month of Ramadhan 1431, which shall be August 10, 2010 until September 10, 2010;

2). Establish a partial Halal kitchen during the Islamic Holy Month of Ramadhan 1431, which shall be August 10, 2010 until September 10, 2010;

3). Provide Plaintiffs Halal food during the Islamic Holy Month of Ramadhan 1431, which shall be August 10, 2010 until September 10, 2010[.]

Petition at p. 3 (docket no. 40).

## II. Discussion

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). *See, e.g.*, *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir. 1976) ("[t]he general function of a preliminary injunction is to maintain the status quo pending determination of an action on its merits"). However, "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *Stenberg v. Cheker Oil Company*, 573 F.2d 921, 925 (6th Cir. 1978) (internal citations omitted).

A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his burden of proving that the circumstances clearly demand it. *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002); *Fort Wayne Women's Health Organization v. Brane*, 734 F.Supp. 849, 850 (N.D. Ind. 1990). Where a prison inmate seeks an order enjoining state prison officials, this court is required to proceed with the utmost care and must recognize the unique nature of the prison setting. *See Kendrick v. Bland*, 740 F.2d 432, 438, n. 3 (6th Cir. l984). Courts must accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Ward v. Dyke*, 58 F.3d 271, 273 (6th Cir. 1995). Correctional officials are professional experts in matters of security and discipline; as such they are better suited to make decisions about security and discipline than

are the courts. *Bell v. Wolfish,* 441 U.S. 520, 547 (1979). Moreover, "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Id.* at 548. For these reasons, a plaintiff attacking administrative decisions about issues of security and discipline must meet a heavy burden.

In reviewing requests for injunctive relief, the court considers (1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the preliminary injunction will cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *See Rock & Roll Hall of Fame v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir. 1998). The four factors listed above are meant to be balanced as they guide the court in exercising its discretion; they are not due rigid application and need not be assigned equal weight. *In re Eagle-Pitcher Indus., Inc.,* 963 F.2d 855, 859 (6th Cir. 1992). The court's discretion is directed at the weight to be given each factor, and the effect to be accorded their mix. While a court need not consider any single factor as either indispensable or dispositive, neither is it required to conclude that all four support its decision. However, it is well established that "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. National Board of Medical Examiners,* 225 F.3d 620, 625 (6th Cir. 2000). Finally, the movant bears the burden of persuading the court that the factors weigh in favor of granting a preliminary injunction. *Granny Goose Foods, Inc. v Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County,* 415 U.S. 432, 441 (1974).

### A. Likelihood of success on the merits

#### 1. Failure to exhaust administrative remedies

First, defendants have filed a motion for summary judgment on the ground that plaintiffs did not exhaust their administrative remedies. *See* docket nos. 31, 32 and 38. The record reflects that plaintiff's did not file grievances against defendants for the claims raised in this action.[1] For this reason, it is unlikely that the court will reach the merits of plaintiffs' claims, and therefore that plaintiffs will prevail on the merits.

#### 2. The Michigan Department of Corrections (MDOC) is currently meeting plaintiffs' dietary needs

Second, even if plaintiffs did met the exhaustion requirement, the record reflects that defendants accommodated Muslim prisoners' religious dietary needs.

In his supporting affidavit, plaintiff Hudson states that plaintiffs must be granted an injunction "[o]rdering Defendants to immediately establish Halal Kitchens and Halal Food Diet Lines, so that effected [sic] persons can freely practice our religious beliefs to the least restrictive means without being compelled to consume and defile our bodies with any food that violates our sincerely held religious beliefs." 2nd Aff. of Grady Hudson at ¶ 2 (docket no. 42). Hudson further contends that there is no rational basis nor legitimate penological interest "in prohibiting Islamic religious diets" when defendants provide "similar religious belief accommodations" for sincere practitioners of the Jewish faith (i.e., a kosher menu) and Buddhists (i.e., a "strict vegetarian" menu). *See* docket nos. 42, 42-3 and 42-4.

---

[1] The court notes that plaintiffs characterize their claims as "non-grievable" under the applicable Michigan Department of Corrections Policy Directives.

Plaintiffs' ability to request a particular religious diet is set forth in the MDOC's policy directive regarding offender meals, which provides in pertinent part as follows:

> D. Offenders shall be permitted to abstain from any foods that violate their religious tenets. Religious menus shall be developed and religious meals provided as set forth in PD 05.03.150 "Religious Beliefs and Practices of Prisoners."

Policy Directive 04.07.100 ¶ D.[2] That policy directive governing "Religious Beliefs and Practices of Prisoners" addresses religious menus in pertinent part as follows:

> RELIGIOUS MENUS/MEALS
>
> OO. The regular diet menu shall be posted a minimum of one week in advance in all facilities at which meals are provided to prisoners to permit observance of any religious dietary restrictions. Prisoners shall be permitted to abstain from any foods that violate their religious tenets. Non-meat entrees shall be available as set forth in PD 04.07.100 "Offender Meals."
>
> PP. Adequate menu substitutions shall be available to prisoners in all facilities at which meals are provided to meet necessary religious dietary restrictions. Any questions as to whether a menu substitution is required shall be referred to the CFA Special Activities Coordinator for resolution.

Policy Directive 05.03.150 ¶¶ OO and PP.

There does not appear to be universal agreement as to what constitutes a halal diet in the prison context. The court addressed the contours of this issue in *Patel v. United States Bureau of Prisons*, 515 F.3d 807 (8th Cir. 2008):

> Patel [the prisoner] converted to Islam while in prison and now believes that he must consume a halal (or "lawful") diet, which prohibits the consumption of pork and other items deemed haram (or "unlawful"). Some forms of Islamic dietary restrictions are stricter than others. For instance, some schools of Muslim thought claim that the Qur'an permits the eating of kosher meat that is lawful to Jews, an interpretation of Sura 5:5 ("The food of those who have received the Scripture is lawful for you, and your food is lawful for them."). Patel's belief in a halal diet demands the strictest type of ceremonial and cleanliness requirements. His halal diet

---

[2] In their response, defendants erroneously cite this provision as ¶ F rather than ¶ D.

does not allow him to consume any meat unless the animal has been slaughtered during a prayer to Allah. Generally, vegetarian dishes are halal unless they have been otherwise contaminated, such as coming into contact with haram foods or being cooked or served in containers that have been in contact with haram foods without being properly cleaned. Such cross-contamination renders the halal foods haram.

*Id.* at 810-11.

In a similar vein, the court in *Thompson v. Aviles*, No. 06-cv-3490, 2008 WL 746666 at *4 (D. N.J. March 18, 2008) observed that "[w]hile it may be that not all vegetarian meals are Halal, they do avoid a vast portion of Haram (impermissible) food, such as pork products or the meat of animals not properly slaughtered." In this regard,

> Whether any given item is Halal (or Kosher for that matter) for the purposes of the First Amendment is subjective, depending upon the individual's personal beliefs. *See generally* Islamic Food & Nutrition Council of Am., What is Halal?, http://www.ifanca.org/halal (last visited March 4, 2008).

*Id.* at n. 4.

Here, plaintiffs have submitted a copy of the IFANCA (Islamic Food and Nutrition Council of America) "guidelines for Establishing a Partial Halel [sic] Kitchen in Prison System." Docket no. 42-2. This particular guideline identifies six categories of food that have been designated as prohibited food for Muslims, or "haram":

> 1) meat of dead animals (carrion); 2) pork and all products derived from pigs; 3) blood; 4) food dedicated to false gods; 5) intoxicants; and 6) carnivorous animals with fangs and birds of prey. Eating these in any form is not permitted for Muslims, unless one is afraid of starvation and feels it is a necessity in order to survive.

Docket no. 42-2.

These particular guidelines further state:

> Halal products contaminated with any of the Haram items during production, processing, preparation and/or serving food also become Haram, when one is aware of such contamination. Additionally, there are strict requirements for making the

7

meat of permitted animals Halal. The animals have to be slaughtered by a Muslim in a prescribed Islamic manner.

*Id.*

The MDOC's "Handbook of Religious Groups" summarizes Muslim dietary rules, similar to the rules discussed in the IFANCA article, by identifying four classes of food items which Muslims are forbidden to consume:

a. Pork, pork by-products and pork derivatives, including bacon, ham, pork chops, spare ribs and lard/shortening.

b. All types of blood, except in the liver and spleen, and insignificant amounts of blood that are impossible to drain even in proper slaughtering.

c. The meat of any animal that has: died naturally, been killed by strangling, been killed by a violent blow, been killed by a headlong fall, been gored to death, been partly eaten by a wild animal unless it can be slaughtered (in the prescribed manner) before it is dead or been sacrificed as an offering to idols.

Docket no. 42-2.

In addition, the following requirements are noted for slaughtering "wholesome meat":

a. The animal should be inspected by an Imam before it is slaughtered, and found to be healthy.

b. The animal should be slaughtered in such a way as to allow its blood to flow out freely and completely, i.e., with a sharp tool cutting the main veins and the throat.

c. No other than the name of Allah is to be invoked at the time of slaughtering. The name of Allah should be invoked over the animal at the time of slaughter, e.g., "With the name of Allah, Allah is Supreme."

d. The meat should be inspected to ensure that it is wholesome and does not contain any matter injurious to human health.

> e. The person who slaughters the animal may be a Muslim, Jew, or certain Christians*, but not an atheist, pagan, or polytheist.
>
> [* Muslims would eat meat slaughtered by Christians or Jews who also refrain from eating pork, i.e., Seventh Day Adventists, etc.; other Christians or Jews may not be careful of utensils.]

*Id.*

Consistent with these dietary rules, the MDOC Handbook provides the following "minimum requirements" for the diet of Muslim prisoners:

> Pork and all its derivatives, intoxicating liquors and harmful drugs are prohibited. Utensils with which pork products are prepared should not be used to prepare Muslim food.

*Id.*

Defendant Brad Purves, is currently employed by the MDOC as the Food Service Manager, Correctional Facilities Administration (CFA). Purves Aff. at ¶ 2 (docket no. 46-2). Mr. Purves previously served as the Acting Food Service Program Manager, a position which included the responsibility for monitoring the food service operations for the MDOC, and he held positions as the Region II Food Service Director, and as the Food Service Director and Assistant Food Service Director at two correctional facilities. *Id.* at ¶¶ 3-4. Mr. Purves provided the following information regarding the menu available to the MDOC's Muslim prisoners:

> 5. The MDOC has denied requests for a halal menu plain because the primary focus of a halal menu is the total abstention from pork and pork products. Prisoner [sic] requesting a halal menu can avoid pork by-products by self-selecting the non-meat entree from the regular meal line, as stated in PD 05.07.100, paragraph H (Attachment 1), and PD 05.03.150, paragraph OO (Attachment 2).
>
> 6. Plaintiffs can avoid "food that dies of itself, and blood and flesh of swine and that on which any other name than that of Allah has been invoked . . ." by not eating meats, and by self-selecting the non-meat

9

> > entrees that are offered at each meal where a meat entree is being served, as stated in MDOC policy.
>
> 7. In order to prevent cross-contamination, the MDOC follows the HACCP plan (Hazard Analysis and Critical Control Point plan) (Attachment 3). This is a comprehensive prevention-based food safety system that identifies and monitors specific food safety hazards that can adversely affect the safety of food products.
>
> 8. The MDOC cooks and serves meat and non-meat entrees separately. See PD 04.07.100 (Attachment 1).
>
> 9. I recently reviewed information on the internet from halal vendors. The information that I reviewed indicates that halal entrees cost 10 times the amount of our daily per-meal cost for out Strict Vegetarian meals, and 4 times more than our kosher meals. Per-meal costs associated with halal entrees do not include the additional costs that would be necessary to establish a separate food preparation area for halal entrees.

*See* docket no. 46-2.

Debbie Lawrence, Assistant Food Service Director at LCF stated in her affidavit: that the LCF Food Service serves the regular statewide menu during Ramadan; that meals are provided pre-dawn and after sunset in the Food Service Dining Room; that food products are purchased through an approved state vendor; that the MDOC distributed a memorandum dated June 17, 2010, regarding the 2010 Ramadan Fast; that the facility's menus offer non-meat entrees during the time of the 2010 Ramadan Fast; that "[w]hen a pork product is scheduled for the evening meal during Ramadan, Food Service switches that day's lunch meal and the evening meal so that the Ramadan participants can have a pork-free evening meal;" that in the past, the food service has provided apples to the Ramadan participants from an approved state vendor for the breaking of their fast (as requested by Chaplain Tompkins); and that the Chaplain has indicated that he will do the same this year. Lawrence Aff. at ¶¶ 1-9 (docket no. 46-1).

10

To the extent that plaintiffs assert that the MDOC's policy directives and handbook regulating halal food violate a constitutional right, the court will consider whether the policy directives and handbook are rationally related to a legitimate penological purpose. *See Turner v. Safley*, 482 U.S. 78 (1987). "In *Turner* we held that four factors are relevant in deciding whether a prison regulation affecting a constitutional right that survives incarceration withstands constitutional challenge: whether the regulation has a 'valid, rational connection' to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are 'ready alternatives' to the regulation." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

The affidavits of Mr. Purves and Ms. Lawrence would support a determination that the MDOC's policy directives and guidelines regarding the minimum requirements for the diet of Muslim prisoners withstand a constitutional challenge. With respect to the first and third *Turner* factors, defendants have demonstrated that the cost of halal entrees is four times as expensive as kosher entrees and ten times as expensive as vegetarian entrees. In addition, the MDOC would experience additional necessary costs to establish a separate food preparation area for halal entrees. With respect to the second *Turner* factor, defendants have demonstrated that Muslim prisoners have an alternative means to exercise their rights (i.e., a halal menu) by self-selecting the non-meat entree from the regular meal line. With respect to the fourth *Turner* factor, while plaintiffs apparently submit that a "ready alternative" exists to the regulation by establishing a halal kitchen, there is no evidence before the court as to the necessary costs associated with that alternative. Accordingly, at this juncture, it appears that the MDOC's policy directives and handbook are rationally related

to a legitimate penological purpose and would withstand plaintiffs' constitutional challenge.

### 3. The MDOC is not required to provide halal meat entrees

Third, plaintiffs cite no constitutional or statutory authority to support the claim that the MDOC must provide them with halal meat entrees. Based upon plaintiffs' submissions, the court will assume that a Muslim prisoner's religious beliefs require him to eat only halal and to avoid haram. These dietary restrictions do not require the MDOC to provide that prisoner with halal meat entrees. On the contrary, courts have determined that a correctional facility need only provide Muslim prisoners with food that is not haram. *See Abdullah v. Fard*, No. 97-3935, 1999 WL 98529 at *1 (6th Cir. Jan. 28, 1999) (where Muslim prisoner alleged that a prohibition against non-halal meat was fundamental to his religion, the court found that he could comply with this prohibition by eating vegetarian meals and that his "First Amendment claim fails because the disputed policy did not force him to violate his religion"). Furthermore, there is no "substantial burden" to plaintiffs' religious beliefs under RLUIPA, because they are given alternatives to eating non-halal meat. *See, e.g., Patel*, 515 F.3d at 810-12 & n. 8 (the prison's meal plan regulations did not substantially burden a Muslim inmate's free exercise of religion where the inmate had access to only vegetarian entrees, some of which he had to pay for himself); *Watkins v. Shabazz*, 180 Fed. Appx. 773, 775 (9th Cir. 2006) (no RLUIPA violation when prisoners given alternatives to eating non-halal meat such as a nutritionally equivalent meat substitute or finding an outside religious organization to contract with the prison to provide halal meat). While plaintiffs may want to have halal meat entrees rather than vegetarian entrees and non-meat substitutes, their food preferences, as prisoners, are limited.

12

As the Supreme Court aptly stated in *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), "the Constitution does not mandate comfortable prisons." [3]

### 4. Summary

Plaintiffs will need to clear a significant procedural hurdle to avoid dismissal of this action for lack of exhaustion of administrative remedies. Even if plaintiffs can demonstrate exhaustion, they have failed to demonstrate that the MDOC must provide them with halal entrees (i.e., meat) and a halal kitchen, both of which are part of the ultimate relief sought by plaintiffs in this action. Plaintiffs have failed to demonstrate a strong or substantial likelihood or probability of success on the merits. Accordingly, the court concludes that this factor strongly favors defendants.

## B. Irreparable Injury

The "key word" in determining the extent of an injury sufficient to support the award of injunctive relief is "irreparable." *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991). Mere injuries, however substantial, are not enough. *Id.* Rather, "the harm alleged must be both certain and immediate, rather than speculative or theoretical." *Id.* "In order to substantiate a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again." *Id.* (internal citations omitted).

Neither Hudson's affidavit, nor the other documents filed by plaintiffs, have presented credible evidence that they are being denied the ability to participate in the 2010 Ramadan

---

[3] While *Rhodes* involved an Eighth Amendment claim, the court's reasoning, i.e., that "persons convicted of serious crimes, cannot be free of discomfort" is applicable here. Plaintiffs inability to obtain a specific type of food is one of the "discomforts" they endure when they are incarcerated for committing crimes.

fast or are being forced to eat haram food during the fast. The June 17, 2010 memorandum from Michael Martin, Special Activities Coordinator, CFA: outlined the basic requirements for Ramadan; advised the wardens that both a pre-dawn and post-sunset meal should be provided to fasting prisoners; advised the wardens that prisoners who receive these sack meal bags should not appear in the meal line for regularly scheduled meals; advised the wardens that prisoners who wish to fast during Ramadan should be accommodated regardless of their specific Islamic religious group membership; and advised the wardens that prisoners who violate the fast and were subject to removal from the fasting list must be issued a Notice of Intent to Conduct an Administrative Hearing. *See* docket no. 44-6. As previously discussed, the LCF menus for the 2010 Ramadan Fast indicate that vegetarian (non-meat) options are available to prisoners. *Id.*

Defendants point out that the four plaintiffs are serving life sentences (Hudson since 1998, Hunter since 1991, Thomas since 2004 and Koss since 1994). *See* docket nos. 44-2, 44-3, 44-4 and 44-5. Assuming these four plaintiffs have been Muslim since their incarceration, they have eaten the halal alternative meals for approximately 12, 19, 6 and 16 years, respectively. By utilizing the MDOC's vegetarian option, plaintiffs can avoid eating haram food during Ramadan (as they apparently have in the past). While plaintiffs may desire to receive halal meat during Ramadan, their failure to receive this particular type of food does not result in irreparable harm sufficient to support injunctive relief. LCF has presented evidence that halal food in the form of a vegetarian menu is available for the 2010 Ramadan Fast. This evidence strongly suggests that plaintiffs' religious dietary needs are being met and that they are not suffering from irreparable injury. Accordingly, this factor favors defendants.

### C. Substantial harm to others

There is no specific evidence before the court that the requested injunctive relief will, or will not, cause substantial harm to others, although it may increase costs. Accordingly, this factor is neutral.

### D. Public interest

Plaintiffs do not seek a court order to maintain the status quo. Rather, plaintiffs seek to have this court direct the LCF food service to prepare and distribute food to Muslim prisoners during Ramadan in a different manner than prescribed in the MDOC policy directives and handbook. Plaintiffs' requested relief would require this court to intervene in the day-to-day operation of LCF's food service which could include: defining "halal food" as that term would apply in the context of a correctional facility; monitoring the purchase of halal food (e.g., whether such food is available from vendors and whether the facility has sufficient funds to purchase it); monitoring the preparation of halal food; and monitoring the process by which LCF would construct, adapt and/or maintain a separate kitchen for preparing halal food.

The court agrees with defendants that the public interest does not favor this court managing the LCF prison food service. The issue of addressing such a basic concern as feeding a prison population is a matter that is best left to the state's prison officials.

> [J]udicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial.

*Bell v. Wolfish*, 441 U.S. 520, 548 (1979). The issuance of a preliminary injunction in this case would unnecessarily intrude into the day-to-day operation of LCF. The record does not suggest that

defendants' operation of the facility poses such a threat to plaintiffs that this court must intervene and exercise its judgment in place of defendants' professional judgment. Accordingly, this factor favors defendants.

### E. Evaluation of the four factors

After reviewing the four factors relevant to issuing injunctive relief, the court concludes that plaintiffs do not have a strong or substantial likelihood of surviving the pending motion for summary judgment based on lack of exhaustion. Assuming that plaintiffs cross this procedural hurdle, they do not have a strong or substantial likelihood of success on the merits of their constitutional and statutory claims. Given that plaintiffs have the alternative of eating a vegetarian menu, the court concludes that plaintiffs' will not suffer irreparable harm. The issue of whether the issuance of a preliminary injunction will cause substantial harm to others is neutral. Finally, there exists a strong public interest in having MDOC employees, rather than this court, manage the LCF food service. For these reasons, the court concludes that plaintiffs' motion for injunctive relief should be denied.

### III. Recommendation

I respectfully recommend that plaintiff's motion for a preliminary injunction (docket no. 40) be **DENIED**.

Dated: August 17, 2010 /s/ Hugh W. Brenneman, Jr.
HUGH W. BRENNEMAN, JR.
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).